## AMERICAN S. S. CO. v. GREAT LAKES TOWING CO.

### No. 3430.

District Court, N. D. Ohio, E. D.

Feb. 6, 1947.

————◆————

Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, for libelant.

Carl A. Schipfer, of Cleveland, Ohio, for respondent.

JONES, District Judge.

In this case I find myself unable clearly to determine the precise fault resulting in the damages, but certain I am that the collision with the red buoy was not pure accident. It was the result of a combination of circumstances, of acts and omissions. The probabilities at least support this finding.

The steamer contends sole fault on the part of the tug and, if the law allows it, there are some facts of probative value to support a prima facie claim in that respect. The steamer was being towed stern first, too fast, considering the turn to be made; the tug did not start to swing the stern soon enough; the red buoy 38 never was on the steamer's port quarter where it would have to be if the turn was to be successfully negotiated.

Also, it well could be found that the tug was late in giving full speed ahead signals to the steamer but it may be that that was something the steamer should have realized if she were alert, although there was evidence that her engines were working ahead before the signals were given. But under the facts and the law can the steamer libelant be exonerated from any contributing fault or responsibility for her own damages?

While the maneuver was a simple one under the normal conditions existing, it is not fair to say that due diligence and faultless navigation could be left solely to the management of the tug. Intelligent and alert cooperation by the steamer was essential to safety. Did the libelant vessel give the assistance required under all of the circumstances? Certainly, to have had an alert and responsive watch aft would have been the better part of due diligence on the part of the steamer. Such a stern watch would have been in position to see the entire operation better than any one else and upon a reasonably careful appraisal of the swing of the stern in relation to the red buoy and the rapidly narrowing distance within which the turn had to be made, considering the sternway of the steamer, if reported to the pilot house promptly, should have contributed to an avoidance of what resulted. The two principle officers were forward on the 512-foot steamer; the Master in the pilot house and the First Mate on the fo'castle deck. While it was important to protect the bows of the steamer against bumping or scraping the docks, the stern held first place once the docks were cleared. The Captain of the steamer knew, what presumably everybody connected with the maneuver knew, that it was approximately 1,300 feet from the end of Dock No. 3 where the movement started to the red buoy on the west bank of the River channel. This was just about 270 feet more than twice the steamer's over-all length. Also, the Captain and officers knew that a sharp turn could not be made unless and until the starboard side was clear of flasher 37 marking the easterly side of the River channel, and the bows clear of the end of Dock No. 2, the latter about 1,000 feet from the red buoy.

Considering conditions at the dock and in the Maumee River on the morning of this accident, the operation would seem to have been a simple piece of navigation. There was no noticeable current in the River and the wind hardly could be said to have been a factor of any consequence, but there was fault somewhere.

There is no dispute but that the signals given by the tug and answered by the steamer were as testified by most of the witnesses who were asked. Nor is there any serious dispute as to the movement of the steamer or the speed of its sternway from the time it was pulled from the slip till it struck the buoy. The main question on the facts is whether the tug negligently handled the stern of the steamer, that is, was the sternway entirely given by the tug

and was it too great considering the movement to be accomplished. Certainly the tug did not pull the stern around fast enough to get it up the River to avoid the red buoy 38, and the west bank of the channel, if it did actually hit the bank.

There is some dispute as to how much the steamer accomplished in response to signals from the tug to put her engines ahead and full steam ahead to check the sternway and thus assist in preventing what ultimately happened. The tug's officers say that there was no evidence of check by the steamer in respect of its sternway although the steamer's witnesses say that her engines were working full steam ahead on a port wheel and rudder even before the tug's signal to do so. It seem incredible that the Consumers Power, with about a mile an hour sternway, could not have been stopped if her engines were working full speed ahead on a port wheel and rudder and the tug at some 90 to 110 degree angle pulling full steam and with all that she had.

From those who were in the best position to see, the red buoy always was on the starboard quarter of the ship, that is, to the right and never was seen down the River on the port side as it should have been to accomplish a successful operation. Unless the steamer was to be handled solely by the tug it seems reasonable to say that the Master of the vessel took inadequate precautions for cooperation in the disposition of his crew and in his orders and instructions to his watches in respect of diligently seeing to it that the ship was making the proper movement to accomplish the desired turn. It seems clear from this evidence that the Watchman was not competent accurately to report to the pilot house what was going on with respect to the stern tow and certainly did not give adequate timing to his reports to the pilot house of the proximity of the stern of the steamer to the red buoy 38.

About the only inferences that can be drawn in the absence of current, wind or weather as factors in the navigation, are that the steamer was either backing too fast considering the turn to be made and the distance within which it could be safely accomplished, or that one tug was not capable of safely performing the operation aided by nothing more than working the steamer's engines ahead.

While I believe the evidence supports the claim of the steamer that her engines were working ahead on a port wheel, yet there is some question whether the vessel could not have been slowed materially, or stopped, if the engines were working full ahead from the time the steamer's witnesses say they were.

However, I am not inclined to attach great weight to the testimony of the Captain of the great ship Herbert, offered as an expert. It was all too simple to respond with such alacrity to the distance within which a vessel of the Consumers Power's type and size could be stopped at a given speed or as to the wrapping or unwrapping of cables or anchor chains about the propeller shaft tending to indicate the movement of the engines when the chain was fouled. If the steamer's engines were working astern it is my judgment that, despite Captain Davenport's confident opinion that the ship would bounce off the bold face of the clay channel bank, the steamer, loaded as she was, would have fetched up with her hind quarter deep in the mud and her propeller, and probably her rudder, embedded and left there when she bounced off.

The question of the application of the Towing Company's Condition 17 depends upon how the tug and the steamer carried out the towing or winding operation. Under the evidence in this case the tug certainly initiated the movement without any request for instructions from the steamer. It did, however, rely upon the steamer's assistance when requested by signals, or when and if it became apparent to the steamer, in the exercise of due care, that she should take action.

Under a considered appraisal of the evidence of what the parties did in carrying out the towage contract, I think it unnecessary to undertake an extended legal research or enter into a judicial discourse as to the legal validity of the Towing Company's Condition 17.

In my view of the case, as the facts developed, it was a cooperative enterprise

requiring the joint or mutual needs of the venture.

On the basis of what has been said, I think there was joint fault and so find, resulting in division of libelant's damages.

Findings and conclusions may be prepared and presented by libelant, upon which a decree in accordance with such findings and conclusions may be entered.